IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

STEVEN J.,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 4:18-cv-04006-SLD-JEH

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 11) and the Defendant's Motion for Summary Affirmance (Doc. 15). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Defendant's Motion for Summary Affirmance be granted and the Plaintiff's Motion for Summary Judgment be denied.

**I**

Steven J. originally filed his application for Disability Insurance Benefits (DIB) on September 4, 2014. He alleged disability beginning on May 1, 2014. His claim was denied initially on April 9, 2015 and was denied upon reconsideration on August 5, 2015. Steven filed a request for hearing concerning his application for DIB on August 21, 2015, and a hearing was held before the Honorable David W. Thompson (ALJ) on February 8, 2017. At that hearing, Steven was represented by counsel and a vocational expert (VE) testified. Following the hearing, Steven's claim was denied on March 30, 2017. His request for review by the Appeals Council was denied on December 27, 2017, making the ALJ's Decision the final

decision of the Commissioner. Steven filed the instant civil action seeking review of the ALJ's Decision on January 8, 2018.

II

Steven was 50 years old on the alleged onset date, and at the time of the hearing he lived in Moline, Illinois with his mother and stepfather. He alleged that his ability to work was limited by unspecified epilepsy, mild epilepsy, hazardous chemical exposure, dizziness, "can't see," and "black out for 1-2 hours." AR 196.

At the hearing, Steven testified that he lived with his mother and stepfather in their two-story house. They drove him to the hearing that day. He graduated from high school and had previously worked as part of the United Automobile Workers (UAW) union. He last worked in May 2014. Steven testified that he was let go from his last job after "I told them my doctor, neurologist, said I cannot do this, go on these high ladders [go down into 10,000 gallon tanks with chemicals in them], changing – anyway. And they said well if you can't do this, we have no place for you." AR 43.

He further testified he took 1,500 milligrams of Keppra per day and while "[i]t seemed to have helped for awhile [sic]," Steven said he had an incident in October 2016. AR 44. He stated he had two seizures in 2016 while he was on the medication. He had zero seizures in 2015 and two in 2014. He also testified that the medication made him tired, but he had no other side effects from it. Steven said he was hospitalized due to seizures in 2013 and 2014. Steven responded in the negative when the ALJ asked him if he had physical impairments other than epilepsy that affected his ability to work. He did not have bad joints. He had never been treated for depression or anxiety. Steven was able to take care of his personal hygiene needs and could feed himself, but he did not cook. Steven's counsel then asked him several questions.

Steven stated he was able to drive, but if he ventured out anywhere, he would be unable to find a destination. He "[got] mixed with signs and stuff when I'm in a new area." AR 48. He said that was a new thing he experienced. He previously worked at John Deere cleaning paint booths, worked at Airways cleaning "like deer and greasy hoods and roofs and that from restaurants and the grates out in Davenport at John Deere," and worked as an appliance deliverer. AR 49. Steven testified he was lightheaded recently and so when he bent over he "got a few headaches once in awhile [sic]." *Id.* He believed he could lift a 40 or 50 pound bag of something once but not repeatedly. Steven did laundry during the day and walked two blocks to get older people in his neighborhood their medicine. He took a nap every day after he took his medication at about 10:30 or 11:00 a.m. He sometimes took two naps in a day. Steven also testified that he did not have any seizures which he did not report to his doctor. "I mean I, I've told him the whole situation. But, no, I haven't had one that I just left him out in the cold." AR 52.

The ALJ then questioned the VE. After she obtained a general description from Steven of one of his past jobs and asked a question about another, the VE explained the changes she needed to make to her report. After that, the ALJ asked the VE some hypothetical questions. The VE testified that Steven's past work would be eliminated given a hypothetical individual with Steven's age, education, experience, and RFC. Such an individual would still be able to perform the following representative jobs: fast food worker; cashier II; and marker I.

### III

In his Decision, at Step Two, the ALJ determined that Steven had the severe impairment of epilepsy and at Step Three, Steven did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ

3

addressed the record references to mental impairments found in the record by consulting examiner Kirk Witherspoon, Ph.D. and determined "these evaluations have no support in the objective medical record." AR 22. He thus did not find any mental impairments to be severe. He also did not find Steven's seizures met or equaled any listings where there was "no evidence in the objective medical record of a typical seizure pattern such that would meet or equal Listing 11.02 [(Epilepsy)]." AR 23. The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he is limited to no climbing of ropes, scaffolds and ladders over 8 feet high; and he needs to avoid even moderate exposure to unprotected heights and unprotected moving machinery.

*Id.* The ALJ then summarized Steven's hearing testimony, discussed his medical records dated between August 2013 and October 2016, and considered the State Agency doctors' opinions. In August 2013, Steven went to the emergency room following a sudden onset of altered mental status and passing out. A CT of his brain was essentially unremarkable. He again went to the emergency room in October 2013 following seizure activity. A CT of his head was again unremarkable. While he wanted to be discharged and follow up with a neurologist, he was advised he should not drive, climb ladders, use heavy machinery, or swim/bathe alone. He made a second trip to the ER in October 2013 following more seizure activity. He was started on Keppra and discharged. An abnormal EEG was suggestive of complex partial seizures.

Steven presented for an epilepsy consultation in June 2014. His neurological examination was normal at that time, he was referred for EEG testing, and he was given a work note indicating he should not work around chemicals or machines. A June 2014 MRI showed nonspecific white matter change probably representing

chronic small vessel disease. An EEG that month was normal and showed no focal slowing or epileptiform abnormalities. In August 2014, Steven denied dizziness and drowsiness during a neurology follow-up. He was taking Keppra daily at that time. His neurological exam was normal and he was again advised he should not do work that involved dangerous chemicals or other machines. At a December 2014 follow-up for epilepsy, Steven reported he had a seizure in September but could not provide a clear description. He also stated he missed his medications around that time. He denied dizziness or drowsiness.

In April 2015, Steven again told his doctor he had no new episodes since the last one in September 2014. His neurologist's July 2015 Epilepsy Report indicated Steven had less than one seizure per month, he was taking two medications and reported no side effects, his seizures were controlled, he had been seizure free for the past nine months, and he had no current restrictions. Steven reported an episode occurred in June 2015, and he denied missing medications at that time. His doctor increased his Keppra dose. In November 2015, Steven reported to a different doctor that he had recurrent seizures since 2013 and had five in the last year. In April 2016, Steven had generalized complaints "but was not sure if they were from the medication." AR 26. In June 2016, Steven reported drowsiness on his medication and again reported that side effect in October 2016, but said it was manageable. He believed he had a seizure in June 2016. The ALJ determined that Steven's seizure disorder could be "anticipated to produce a certain amount of limitations, but the claimant has not demonstrated limitations in excess of those accounted for in the residual functional capacity." AR 27.

The ALJ gave "great weight" to the State Agency doctors' opinions "to the extent they found the claimant's impairments do not meet or equal a Listing and are not disabling." *Id.* The ALJ further explained that the actual RFC determined

in the Decision was based upon all the evidence of record including evidence that was not before the State Agency.

IV

Steven filed both a Motion for Summary Judgment and another document filed as a Notice regarding Medical Visits (Doc. 12). The Court considers the additional filing together with Steven's Motion. In his Motion, Steven argues that he cannot do the work he did all his life, continues to suffer from epilepsy, and "you people tell me to get a light duty job at minimum wage 29 hr a week which will not even pay for [his] meds." Plf's MSJ (Doc. 11 at pg. 2). He also argues that with the medication he takes there "is depression, anxiety, anger, mood swings, waking up every 2 hrs, stomach irritation, urinating very frequently, taking naps after dosage, and memory loss." *Id.* He contends he "cannot even get help for being diagnosed as being retarded!" *Id.* at pg. 3. Finally, Steven provides that he experienced an episode on May 29, 2018 of loss of consciousness, sweating, slurred speech and mumbled words, light headedness, and dizziness. Plf's Notice (Doc. 12 at pg. 1). He states that he now cannot, in addition to previously imposed limitations, drive for six months. He attached an After Visit Summary dated July 3, 2018 from UnityPoint Health Trinity Moline Emergency Department.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper

legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

> 4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
>
> 5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Steven does not take issue with the ALJ's Decision at any one step, but instead simply claims the ALJ committed error by ultimately finding him not disabled.

## A

Because the Commissioner has clearly framed her arguments, the Court frames its analysis of the ALJ's Decision likewise. The Court begins its analysis with a recitation of what an ALJ's Decision must provide. An ALJ need not mention every piece of evidence as long as he builds a logical bridge from the evidence to his conclusion. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Stated another way, an ALJ must "sufficiently articulate his assessment of the evidence to assure [the court] that the ALJ considered the important evidence . . . and to enable [the court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). An ALJ "may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.

2009). While the court reviews the record as a whole, it will not reweigh the evidence or substitute its judgment for that of the ALJ. *Id.* at 475.

## B

The Commissioner first argues that the record supports the ALJ's finding that Steven's epilepsy was a severe impairment and that his impairments did not meet or medically equal a listing. A "severe" impairment is an impairment or combination of impairments that "significantly limits [one's] physical or mental ability to do basic work activities." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010), *citing* 20 C.F.R. § 404.1520(c). In his Decision at Step Two, the ALJ explicitly rejected the consulting examiner's reports that Steven has a mental impairment. The ALJ noted there was no evidence of anxiety, depression, cognitive disorder, or any other mental ailment in his treating records. He also noted the fact that Steven worked at a full-time job until 2014 and was terminated then due to his seizure activity. Finally, the ALJ stated Steven did not present any credible evidence that he had any deficits in any of the B or C criteria "of any mental Listing at 12.00 et seq." AR 23.

The ALJ sufficiently articulated the reasons for not finding any additional severe impairments from which Steven suffered. Steven points to no evidence the ALJ failed to consider. As the Commissioner points out, though Steven asserts in his Motion that he was diagnosed with mental retardation, he offers no such evidence. Also, because the ALJ found Steven's epilepsy to be severe, the ALJ was obligated to proceed with the evaluation process. Thus, a determination that Steven's mental impairments were non-severe was of no consequence. *Castile*, 617 F.3d at 927. Because the ALJ made no error at Step Two, his determination at Step Three that Steven's impairments did not meet or medically equal the severity of a listed impairment is also sufficiently articulated and substantially supported.

Steven had the burden of showing his impairments met a listing, and he had to show that his impairments satisfied all of the various criteria specified in the listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Nevertheless, an ALJ must mention the specific listing he is considering and must also offer more than a perfunctory analysis of the listing. *Ribaudo*, 458 F.3d at 583, *citing Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The ALJ explicitly considered whether Steven's seizures met or equaled Listing 11.02. The ALJ provided more than a perfunctory analysis of Listing 11.02 where he identified what was specifically required of that listing and then highlighted the evidence that was insufficient. The ALJ, citing to particular places in the record, explained that the "neurological records show, since starting medication, the claimant has experienced only three seizures in the past three years, one of which was attributed to the claimant's failure to take his seizure medication." AR 23.

The ALJ also gave the State Agency doctors' opinions "great weight to the extent they found the claimant's impairments do not meet or equal a Listing and are not disabling." AR 27. The Seventh Circuit Court of Appeals has explained that Disability Determination and Transmittal forms "conclusively establish that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *see also Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1003 (N.D. Ill. 2010) (describing *Scheck*'s discussion with regard to Disability Determination and Transmittal forms in the record as indicative of the Commissioner's consideration of medical equivalence a "safe haven"). An ALJ may properly rely upon those experts' opinions and such opinions in the record provide substantial evidence to support the ALJ's finding that a claimant does not meet or equal a listing. *Scheck*, 357 F.3d at 700. Thus, the ALJ's Step Three finding is substantially supported.

## C

The Commissioner next argues that the record supports the ALJ's RFC finding that Steven was capable of performing a range of light-level work. A claimant's RFC "is the most he can still do despite his limitations." 20 C.F.R. § 404.1545(a). An RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe[.]" *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).

After he set forth his RFC finding, the ALJ recited Steven's hearing testimony, considered medical records and examination results dated between August 2013 and October 2016, and considered the medical opinions of record. As he was required to do, the ALJ provided a narrative discussion of the record evidence and described how the evidence of Steven's seizures was accounted for in the RFC. The ALJ confirmed Steven had a documented seizure disorder, noting EEG results which confirmed he had intermittent spikes over the right temporal. While the medical records included regular follow up visits with Steven's neurologist since his epilepsy diagnosis, the ALJ pointed out that those neurology records did not support that Steven's seizures were "frequent or severe enough to be completely disabling." AR 27.

The ALJ provided that Steven did experience several seizures in late 2013, including several emergency room visits, "but this was prior to his diagnosis and staring [sic] on any medication[.]" *Id*. The ALJ continued: "Since seeing a

11

neurologist in June 2014, [Steven's] seizures have been well controlled and infrequent . . . He did report a seizure in September 2014, but also admitted he had missed taking his medication around that time[.]" *Id.* The ALJ additionally explained that Steven's doctors did not think his seizures were serious or frequent enough to recommend that he completely refrain from driving – Steven then-currently had a valid driver's license and drove several times per week. The ALJ concluded that, overall, the record was clear that Steven was unable to perform his past work which required exposure to workplace hazards. Steven did not demonstrate that his seizure activity would prevent less demanding work that did not require recurrent exposure to workplace hazards.

While Steven argues in his motion that he experiences a litany of side effects from his medication, the ALJ expressly considered one that appeared in the record – fatigue necessitating naps – but concluded that the alleged severe side effects were inconsistent with Steven's medical records. The ALJ noted that at most of Steven's visits "he denied any side effects at all and stated he had no drowsiness or dizziness" and when he did report some drowsiness in October 2016, Steven also stated that it was manageable. AR 27. This is not a case in which the ALJ ignored an entire line of contrary evidence. *Terry*, 580 F.3d at 477. He confronted the evidence of record pertaining to Steven's side effects, the seizures he experienced both before his alleged onset date and during the time following it, and even addressed the State Agency doctors' opinions that Steven had a severe joint dysfunction. With regard to those opinions, the ALJ explained that Steven's "actual residual functional capacity determined herein is based on all the evidence of record including evidence not before the State Agency." AR 27. Further:

> Their finding that the claimant has a severe joint dysfunction is given little weight, as the record does not show any treatment for any musculoskeletal condition. The claimant specifically testified that he

>does not have any impairment other than epilepsy that affects his ability to work and does not have any problems with his joints.

*Id*. at 27-28. It is clear that the ALJ considered the important evidence and did so within the proper legal framework. *See Barnett*, 381 F.3d at 668 ("We will uphold an ALJ's decision as long as the ALJ applied the correct legal standard, and substantial evidence supports the decision"). Given the ALJ's narrative discussion of the evidence, it is clear that the ALJ's findings are supported by substantial evidence.

Steven's new evidence of a seizure in May 2018, filed six months after he filed the instant lawsuit, cannot be considered by this Court. A court charged with reviewing a case may consider new evidence if "there exists 'new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding'." *Schmidt v. Barnhart*, 395 F.3d 737, 741-742 (7th Cir. 2005), *citing* 42 U.S.C. § 405(g). Evidence is deemed "material" if "there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Id*. at 742. However, the new evidence is only material if it is also "relevant to the claimant's condition 'during the relevant time period encompassed by the disability application under review'." *Id*., *quoting Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990). Here, Steven seeks to introduce new evidence of a seizure that occurred, per his own representations, on May 29, 2018, and he also presents an After Visit Summary dated July 3, 2018. Such new evidence is nearly 14 months and 16 months, respectively, after the ALJ's March 30, 2017 Decision. The evidence is therefore not material because it does not apply to Steven's condition during the relevant time period; it shows Steven's condition at that later point, not what his condition was at the time relevant to the hearing and Decision on his disability application.

**D**

Finally, the Commissioner argues that the record supports the ALJ's finding at Step 5 that there were a significant number of jobs in the national economy that Steven could perform. Specifically, the Commissioner argues in response to the arguments Steven makes in his Motion: 1) the test is not whether Steven is actually able to find a job (he states he cannot find a job), but rather is whether work exists in the national economy in significant numbers; and 2) the ability of work wages to pay for treatment (he argues a light duty minimum wage job will not even pay for his medicine) is not part of the sequential analysis to determine whether a claimant is disabled. The Commissioner is correct in both respects.

At the hearing, Steven's counsel did not object or otherwise cast doubt on the VE's testimony pertaining to the work that an individual could do with Steven's RFC, age, education, and experience. The VE's testimony remains uncontradicted. It was therefore not error for the ALJ to rely upon the VE's testimony at Step Five. *See Liskowitz v. Astrue*, 559 F.3d 736, 745-46 (7th Cir. 2009) (holding that where the VE identifies a significant number of jobs a claimant is capable of performing and such testimony is uncontradicted, it is not error for an ALJ to rely upon the VE's testimony). Any arguments Steven attempts to make that the ALJ's Decision must be remanded because he has not actually been hired to perform one of the identified jobs and such jobs, in any event, will not pay for his medication must fail. The question is whether a claimant is able to perform any other work existing in significant numbers in the national economy; it is *not* whether he actually becomes employed or whether any such employment provides enough wages to cover the cost of his medications. *See* 20 C.F.R. § 404.1520 (setting forth the five-step test to determine whether a claimant is disabled).

V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 11) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 15) be granted; 3) judgment be entered in favor of the Defendant, Commissioner of Social Security, and against the Plaintiff, Steven J.; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on January 8, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE